IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY BOKIN, | ) |
| | ) |
|         Plaintiff, | ) |
| | ) |
|     vs. | ) Civil Action No. 06-851 |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
|         Defendant. | ) |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff, Ashley Bokin, seeks judicial review of a decision

of Defendant, Commissioner of Social Security ("Commissioner"),

denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") under Titles II

and XVI, respectively, of the Social Security Act, 42 U.S.C.

§§ 401-433 and §§ 1381-1383f.[1]  Presently before the Court are the

parties' cross-motions for summary judgment pursuant to

Fed.R.Civ.P. 56.  For the reasons set forth below, Plaintiff's

---

[1]The Social Security program provides two types of benefits
based on an individual's inability to engage in substantial
gainful activity.  The first type of benefits, DIB, provides
benefits to disabled individuals who have paid into the Social
Security system through past employment.  The second type of
benefits, SSI, provides benefits to disabled individuals who meet
low-income requirements regardless of whether the individuals
have ever worked or paid into the Social Security program.  *See,*
*e.g.,* Belcher v. Apfel, 56 F.Supp.2d 662 (S.D.W.V.1999).  Based
on her earnings record, Plaintiff meets the insured status
requirements of the Social Security Act for purposes of DIB
through June 30, 2005.  (R. 20).  Thus, to receive DIB, Plaintiff
must establish that she was disabled before that date.

1

motion for summary judgment seeking a remand of this case for further proceedings will be granted, and the Commissioner's cross-motion for summary judgment will be denied.

## II. Background

### A. Procedural History

Plaintiff filed applications for DIB and SSI on October 19, 2004, alleging disability since October 1, 2004 due to anorexia nervosa[2] and anxiety. (R. 75-77, 91-97, 255-57). Following the denial of Plaintiff's applications for DIB and SSI, she requested a hearing before an Administrative Law Judge ("ALJ"). (R. 61-66, 67-68, 258-63). At the hearing, which was held by ALJ Paul R. Sacks on December 8, 2005, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 35-60). During the hearing, Plaintiff's counsel indicated that he had requested Plaintiff's complete treatment records from Mon Yough Community Services, Inc. ("Mon Yough"), but that the records had not yet been received.[3]  Based on this representation, the ALJ

---

[2]Anorexia nervosa is an eating disorder in which a person refuses to stay at even the minimum body weight considered normal for their age and height. Persons with this disorder may have an intense fear of weight gain and distorted body image. Inadequate eating or excessive exercising results in severe weight loss. See www.nlm.nih.gov/medlineplus/encyclopedia (last visited 10/29/2007).

[3]At the time of the hearing before the ALJ, the medical evidence included two documents relating to Plaintiff's treatment at Mon Yough. The first document is the report of a psychiatric evaluation of Plaintiff, which was performed by Omar Bhutta, M.D. on December 8, 2004. (R. 228-29). The second document is a note

2

stated that he would hold the record open for 30 days to give counsel an opportunity to submit the complete treatment records of Mon Yough before he issued his decision.  (R. 53-54, 59).

On February 15, 2006, more than 30 days after the hearing but before the ALJ issued a decision, Plaintiff's counsel sent a fax to the ALJ, together with two records from Mon Yough.[4]  In the fax, counsel indicated that he was still attempting to obtain additional treatment records from Mon Yough, and he thanked the ALJ for his patience.  (R. 249-53).

On March 10, 2006, Plaintiff's counsel faxed the following letter to the ALJ:

Dear Judge Sacks:

As you know the record was held open after the hearing on December 8, 2005 for records from Mon-Yough MH/MR.  We have been in contact with their medical records department on numerous occasions, and have not been able to obtain records that clearly exist.  I have no idea what the problem is, frankly; I initially received some of the records very quickly and now cannot even get a response.

_____

written by Dr. Bhutta on September 23, 2005 in which he opined that Plaintiff was unable to work at that time due to anorexia nervosa.  (R. 247).

[4]The additional evidence submitted to the ALJ by counsel on February 15, 2006 concerning Plaintiff's treatment at Mon Yough consists of two reports.  The first report is the report of Dr. Bhutta's psychiatric evaluation of Plaintiff on December 8, 2004, which was already in the record.  (R. 228-29, 252-53).  The second report is a progress report completed by Dr. Bhutta on March 8, 2005 which merely indicates that he saw Plaintiff and filled out forms for her.  The report provides no information concerning Plaintiff's condition or the progress of her treatment.  (R. 251).

3

In light of these developments, I feel that the only
recourse left is to ask that you issue a subpoena to the
medical records custodian.

Thank you for your consideration.  If you have any questions
or comments, please feel free to contact me.

Very truly yours,
Karl E. Osterhout

(Document No. 9).[5]

On March 27, 2006, Plaintiff's counsel faxed another letter

to the ALJ which stated:

Dear Judge Sacks:

Please find attached records from Western Psychiatric
Clinic; note that these are not the records which we
continue to await from Mon-Yough MH/MR.  I have not heard
back froyou (sic) regarding the request we made last month
for a subpoena to obtain those records.  Please advise as
soon as possible concerning that request.

Very Truly yours,
Karl E. Osterhout[6]
(R. 264-70).

---

[5]For unknown reasons, counsel's March 10, 2006 fax to the
ALJ is not in the administrative record in this case.  Thus,
counsel submitted the fax as an exhibit to his brief in support
of summary judgment.

[6]With respect to the treatment records of Western
Psychiatric Institute and Clinic ("WPIC") which were attached to
counsel's March 27, 2006 fax, the Court notes that the records
included (a) a one-page letter to counsel from the Medical
Records Department of WPIC indicating that copies of a
Psychiatric Evaluation Form, History and Physical and Interim
Discharge Note concerning an "episode" on October 21, 2005 were
attached (R. 266), and (b) a 4-page report of an evaluation of
Plaintiff at WPIC on October 7, 2005, which was performed at the
request of Plaintiff's psychotherapist at Mon Yough due to her
concern about Plaintiff's weight.  (R. 267-70).  The report does
not relate to the October 21, 2005 "episode" referred to in the
cover letter to Plaintiff's counsel.

4

The next day, March 28, 2006, the ALJ issued a decision denying Plaintiff's applications for DIB and SSI based on his conclusion that Plaintiff retained the residual functional capacity ("RFC") to perform light work existing in significant numbers in the national economy.[7]  The decision does not mention counsel's February 15, 2006 fax to the ALJ regarding his unsuccessful attempts to obtain Plaintiff's complete treatment records from Mon Yough, or counsel's March 10, 2006 fax to the ALJ requesting a subpoena to obtain those records, or counsel's March 27, 2006 fax to the ALJ in which the request for a subpoena is repeated.  (R. 15-25).

On March 31, 2006, Plaintiff filed a request for review of the ALJ's decision.  (R. 12).  On the same day, in lieu of a legal brief, Plaintiff's counsel faxed a letter to the Appeals Council in which he asserted that the ALJ erred in three respects in denying Plaintiff's applications for DIB and SSI: first, by failing to give appropriate weight to the opinions of Plaintiff's treating sources at WPIC and Mon Yough; second, by denying Plaintiff's applications for DIB and SSI based on the VE's

_____

[7]The Social Security Regulations define RFC as the most a claimant can still do despite his or her limitations.  20 C.F.R. § 404.1545.  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls...."  20 C.F.R. § 404.1567(b).

testimony in response to a hypothetical question that did not

include all of the limitations resulting from Plaintiff's

anorexia nervosa; and third, by failing to respond to the

multiple requests of Plaintiff's counsel for issuance of a

subpoena to obtain Plaintiff's complete treatment records from

Mon Yough.   (R. 12-14).

By letter dated April 28, 2006, the Appeals Council notified

Plaintiff of the denial of her request for review.   The April 28th

notice does not mention counsel's March 31, 2006 fax to the

Appeals Council.   (R. 5-7).   Subsequently, by letter dated August

25, 2006, the Appeals Council notified Plaintiff that the earlier

denial of her request for review had been set aside for

consideration of additional evidence, but that, after considering

the evidence, her request for review would be denied again.[8]   (R.

8-10).   Consequently, the ALJ's decision became the final

decision of the Commissioner.   This appeal followed.

---

[8]The additional evidence considered by the Appeals Council
consisted of counsel's fax to the ALJ on March 27, 2006 in which
he repeated his request for issuance of a subpoena for
Plaintiff's complete treatment records from Mon Yough, as well as
the evidence submitted to the ALJ with the March 27th fax.   (R.
264-70).   As noted in footnote 6, the first page of this
additional evidence was a one-page letter to Plaintiff's counsel
from WPIC's Medical Records Department indicating, in error, that
certain documents pertaining to an October 21, 2005 "episode"
were attached (R. 266), and the remaining 4 pages were the report
of an evaluation of Plaintiff on October 7, 2005 which was
performed as the result of a referral by Plaintiff's
psychotherapist at Mon Yough due to her concern about Plaintiff's
weight.   (R. 267-70).

## B. Factual Background

Plaintiff was born on August 4, 1983. She was 22 years old at the time of the hearing before the ALJ. (R. 29). With respect to education, Plaintiff is a high school graduate. (R. 42). In the past, Plaintiff has been employed as a cook, cashier, deli worker and dietary aide.[9] (R. 42-44).

Plaintiff is 4'11" tall, and, although the most recent medical chart in the record at the time of the hearing indicated that Plaintiff weighed 96 pounds, she testified that her weight had dropped to 78 or 79 pounds. Plaintiff attributed the weight loss to anorexia nervosa, testifying that she had been hospitalized on several occasions for this condition. (R. 39-40, 44). At the time of the hearing, Plaintiff was seeing a psychotherapist, Anita Heider, at Mon Yough on a weekly basis. Plaintiff also is seen by Dr. Bhutta at Mon Yough. However, Plaintiff testified that she only sees Dr. Bhutta when she needs re-assessment forms completed for welfare. (R. 45). As to medications, Plaintiff testified that she takes Mylicon,[10] as well as a multi-vitamin and a calcium supplement. (R. 45). According to Plaintiff, she is unable to work due to physical exhaustion

---

[9]Plaintiff testified that all of these jobs were part-time jobs. (R. 51).

[10]Mylicon is used to treat the symptoms of gas such as uncomfortable or painful pressure, fullness and bloating. *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 10/29/2007).

7

resulting from her eating disorder.  (R. 48).

## C. Vocational Expert Testimony

At the hearing on Plaintiff's applications for DIB and SSI,
the ALJ asked the VE to assume a hypothetical individual of
Plaintiff's age, education and work experience who is capable of
performing light work with the following limitations: (1) the
individual should avoid jobs with a high degree of manual
dexterity and rapid hand movements; (2) the individual requires a
sit/stand option; (3) the individual should avoid exposure to
fumes, dust, gases, odors, dampness, humidity and poorly
ventilated areas; and (4) the individual should avoid work
involving heights, moving machinery and the need to climb
ladders, ropes or scaffolding.  (R. 56-57).  The ALJ then asked
the VE whether there were any jobs that the hypothetical
individual could perform.  The VE responded affirmatively,
identifying the jobs of hotel/motel clerk, information clerk and
security guard.  Plaintiff's counsel then asked the VE whether
her response to the ALJ's hypothetical question would change if
the hypothetical individual also needed to rest every 1 to 2
hours.[11]  She responded affirmatively, testifying that such a
requirement would be inconsistent with the definition of

_____

[11]Counsel added this limitation to the ALJ's hypothetical
question based on Plaintiff's testimony that she has to rest for
several hours after engaging in normal daily activities, such as
cleaning or preparing food, for an hour.  (R. 51).

8

substantial gainful activity (*i.e.*, 8 hours a day, 5 days a week).   (R. 57-59).

## D.   Medical Evidence[12]

A note of a medication check at Vista Behavioral Health Associates on February 4, 2004 indicates that Plaintiff had been fired from her job in December 2003; that Plaintiff's parents had kicked her out of the house the previous week following an argument; and that Plaintiff had poor insight and judgment about how she was going to live.[13]   Plaintiff reported that she no longer wanted to take Zoloft.   Nevertheless, she was encouraged to be compliant with the medication.[14]   (R. 150).

On August 23, 2004, Plaintiff was admitted to UPMC

---

[12]Plaintiff was diagnosed with an eating disorder and depression in 1994 (R. 160), and the administrative file in this case contains records relating to Plaintiff's treatment for these conditions dating back to 1997.   (R. 118-26, 127-31).   Because the alleged onset date of Plaintiff's disability is October 1, 2004, the Court will limit its summary of the medical evidence to the evidence pertaining to Plaintiff's treatment since 2004.

[13]The administrative file in this case includes records concerning Plaintiff's treatment at Vista Behavioral Health Associates beginning in August 1998.   (R. 148-67).   It appears that the February 4, 2004 medication check was the last time Plaintiff was treated at this facility.   A Contact & Authorization Sheet in the record indicates that Plaintiff was a "no show" for a medication check scheduled for May 5, 2004, and there is no other evidence relating to treatment at this facility.   (R. 149).

[14]Zoloft is used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder and social anxiety disorder.   *See* www.nlm.nih.gov/medlineplus/druginfo (last visited 10/29/2007).

9

McKeesport Hospital for complaints of weakness, dizziness, light-headedness, vertigo, tiredness and abdominal pain of 2 weeks' duration.  Plaintiff, who weighed 103 pounds at the time of admission, reported that she had been eating soup and crackers once a day for 4 weeks because she wanted to lose weight, and that she had lost 20 pounds in 6 weeks.  The assessment of Plaintiff's condition was anorexia with low potassium, abdominal pain, abnormal liver function tests and depression.  During this hospitalization, Plaintiff was evaluated by Dr. Placci, a psychiatrist, who diagnosed Plaintiff with an eating disorder and an adjustment disorder with mild depression.  With respect to Plaintiff's physical condition, Dr. Placci indicated that Plaintiff was suffering from anorexia, dehydration, deconditioning and weight loss, and he assessed Plaintiff's score on the Global Assessment of Functioning ("GAF") Scale as "[m]aybe 30."[15]  Plaintiff was treated and discharged to WPIC in "generally stable condition" on August 25, 2004.  (R. 178-83).

_____

[15]The GAF Scale considers psychological, social and occupational functioning on a hypothetical continuum of mental health to mental illness.  The highest possible score is 100, and the lowest is 1.  A GAF score between 21 and 30 indicates that **[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment** (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) **OR inability to function in almost all areas** (e.g., stays in bed all day; no job, home, or friends). (Bold face in original).  American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV"), at 32-34.

10

At the time of her initial psychiatric evaluation at WPIC on August 25, 2004, Plaintiff expressed concerns with WPIC's rules, indicating that she was not going to do anything she did not want to do, and that she intended to sign herself out of treatment to start school the following week.[16]   The evaluator described Plaintiff's diagnoses as "Adjustment D/O with mixed disturbance of emotions and conduct" and "Anorexia Restricting type," and she assessed Plaintiff's GAF score to be 30.   The plan for Plaintiff included admission to a locked unit for 24-hour nursing care and observation, no medications except Tylenol and Ativan,[17] lab work to monitor anemia and EKG bradycardia and observation every 15 minutes.   (R. 224-26).

On October 7, 2004, Plaintiff was admitted to UPMC McKeesport Hospital for dehydration with severe hyponatremia and hypokalemia secondary to anorexia.[18]   (R. 185, 187-89).   On

---

[16]The evaluation report indicates that Plaintiff was known to WPIC, and that her last contact with WPIC had been as an outpatient in 1998.   (R. 224).

[17]Tylenol is used to relieve mild to moderate pain from headaches, muscle aches, menstrual periods, colds and sore throats, toothaches, backaches, reactions to vaccinations (shots), and to reduce fever.   Ativan is used to relieve anxiety. www.nlm.nih.gov/medlineplus/druginfo (last visited 10/29/2007).

[18]Hyponatremia involves not having enough sodium in the body fluids outside the cells.   Sodium is a critical component in blood pressure maintenance.   It is also essential for the proper working of nerves and muscles.   Hypokalemia means low blood levels of potassium.   See www.nlm.nih.gov/medlineplus/ encyclopedia (last visited 10/29/2007).

11

October 8, 2004, L. Alan Wright, M.D., a psychiatrist, performed

a psychiatric assessment of Plaintiff, noting Plaintiff had

sustained a significant weight loss (35 pounds since August 11,

2004), had a history of anorexia and was in a "great deal of

denial about the seriousness of her situation."  Dr. Wright

assessed Plaintiff's score on the GAF scale to be 25, and he

recommended that Plaintiff be referred to a specialized treatment

program at WPIC for her condition.  Dr. Wright noted that

Plaintiff had been referred to WPIC in August 2004, but had only

stayed one day, and he indicated that, if necessary, involuntary

hospitalization should be obtained.  (R. 193-94).  Plaintiff was

discharged to WPIC in stable condition on October 9, 2004.  (R.

186).

A discharge note from WPIC dated October 28, 2004 indicates

that Plaintiff had been admitted on a "303" following

hospitalization at UMPC McKeesport Hospital;[19] that Plaintiff

initially denied any disorder behaviors; that Plaintiff was very

---

[19]The reference in the discharge note to Plaintiff's "303"
admission to WPIC relates to a Pennsylvania statute pursuant to
which a person may be involuntarily committed for extended
emergency treatment not to exceed 20 days.  See 50 P.S. § 7303.
The need for such a commitment must be certified by a judge or
mental health review officer.  Whenever a person is no longer in
need of immediate treatment and, in any event, within 20 days
after the filing of the certification for a "303" admission, the
person must be discharged unless he or she is admitted to
voluntary treatment under 50 P.S. § 7202 or a court orders
involuntary treatment pursuant to 50 P.S. § 7304 which provides
for court-ordered involuntary treatment not to exceed 90 days.

anxious and her mood was "low;" that Plaintiff refused the
treatment team's recommendation of a trial of anti-depressant
medication; that Plaintiff had poor insight into her illness; and
that the legal status of Plaintiff's follow-up treatment at WPIC
was "voluntary."  At the time of discharge, Plaintiff's GAF score
was assessed to be 40.[20]  (R. 221).

     In an October 28, 2004 discharge summary pertaining to
Plaintiff's evaluation for "201" or voluntary treatment at WPIC
following the period of involuntary treatment, it is noted that
Plaintiff expressed a desire to withdraw from treatment,
indicating her lack of interest in inpatient treatment for an
eating disorder at that time.[21]  Because Plaintiff's weight and
lab work were normal and because Plaintiff's family physician
agreed to accept medical responsibility for her, she was
discharged from treatment at WPIC.  (R. 222).

     Omar Bhutta, M.D., a psychiatrist at Mon Yough, performed a

---

[20]A GAF score between 31 and 40 denotes "**[s]ome impairment in
reality testing or communication** (e.g., speech is at times
illogical, obscure, or irrelevant) **OR major impairment in several
areas, such as work or school, family relations, judgment,
thinking, or mood** (e.g., depressed man avoids friends, neglects
family, and is unable to work; child frequently beats up younger
children, is defiant at home, and is failing at school). (Bold
face in original).  DSM-IV, at 32-34.

[21]Under 50 P.S. § 7201, any person 14 years of age or older
who believes that he or she is in need of treatment and
substantially understands the nature of voluntary treatment may
submit himself or herself to examination and treatment, provided
the decision to do so is made voluntarily.

13

psychiatric evaluation of Plaintiff on December 8, 2004.[22]   With
respect to Plaintiff's mental status examination, Dr. Bhutta
noted that Plaintiff was alert and oriented x 3; that she was
appropriately dressed; that she appeared somewhat underweight;
and that she exhibited no depressive symptoms.   In addition, Dr.
Bhutta noted that Plaintiff denied suicidal or homicidal
ideation, delusional thinking and auditory or visual
hallucinations, her intellectual capacity appeared to be average,
and her insight and judgment were limited.   Dr. Bhutta diagnosed
Plaintiff with anorexia nervosa and assessed her GAF score to be
50.[23]   Dr. Bhutta indicated that Plaintiff would be started on
Remeron,[24] and that he would see her in one month.   In the
interim, Plaintiff was advised to continue her individual
psychotherapy at Mon Yough.   (R. 228-29).

On December 16, 2004, after reviewing Plaintiff's
administrative file but without an examination, a State agency

_____

[22]With respect to the history of Plaintiff's illness, Dr.
Bhutta noted, among other things, that Plaintiff had been
involuntarily committed to WPIC several months earlier; that
Plaintiff had stayed at WPIC for 3 weeks; and that, upon
discharge from WPIC, Plaintiff was referred to Mon Yough for
continuing outpatient treatment.   (R. 228).

[23]A GAF score between 41 and 50 denotes "**[s]erious symptoms**
(e.g., suicidal ideation, severe obsessional rituals, frequent
shoplifting) **OR any serious impairment in social, occupational,
or school functioning** (e.g., no friends, unable to keep a job).
(Bold face in original).   DSM-IV, at 32-34.

[24]Remeron is used to treat depression.   *See* www.nlm.nih.gov/
medlineplus/druginfo (last visited 10/29/2007).

psychological consultant completed a Psychiatric Review Technique
form in connection with Plaintiff's applications for DIB and SSI
based on the anxiety-related disorder of anorexia nervosa.   The
consultant opined that Plaintiff was moderately limited with
regard to activities of daily living, social functioning and
concentration, persistence or pace, and that there was
insufficient evidence of repeated episodes of decompensation,
each of extended duration.   The consultant also completed a
Mental RFC Assessment for Plaintiff.   With respect to
Understanding and Memory, the consultant indicated that Plaintiff
was moderately limited in her ability to understand and remember
detailed instructions.   As to Sustained Concentration and
Persistence, the consultant indicated that Plaintiff was
moderately limited in her (a) ability to carry out detailed
instructions, (b) maintain attention and concentration for
extended periods, (c) perform activities within a schedule,
maintain regular attendance and be punctual within customary
tolerances, (d) complete a normal workday and workweek without
interruptions from psychologically based symptoms, and (e)
perform at a consistent pace without an unreasonable number and
length of rest periods.   Regarding Social Interaction, the
consultant indicated that Plaintiff was moderately limited in her
ability to (a) interact with the general public, (b) accept
instructions and respond appropriately to criticism from

15

supervisors, (c) maintain socially appropriate behavior, and (d) adhere to basic standards of neatness and cleanliness. Finally, as to Adaptation, the consultant indicated that Plaintiff was moderately limited in her ability to (a) respond appropriately to changes in the work setting, (b) set realistic goals, and (c) make plans independently of others. The consultant also opined that Plaintiff "will make a satisfactory recovery before the completion of the 12 month duration period."[25]   (R. 230-46).

On September 23, 2005, Dr. Bhutta wrote the following note regarding his opinion of Plaintiff's ability to work:

> To Whom It May Concern:
>
> Ms. Ashley Bokin is currently in treatment here at Mon Yough Community Services, Inc. for a diagnosis of Anorexia Nervosa.  Ms. Bokin is in need of continued treatment for this ailment, and is unable to work to support herself at this time.
>
> Sincerely,
> Omar Bhutta, M.D.

(R. 247).

On October 7, 2005, Plaintiff was referred to WPIC for evaluation by her psychotherapist at Mon Yough, Anita Heider, due

---

[25]With respect to the prediction of the State agency psychological consultant concerning the expected duration of Plaintiff's severe impairment, as noted previously, Plaintiff's alleged onset date of disability is October 1, 2004.  Thus, at the time the consultant rendered his opinions, only 3 months had elapsed since Plaintiff's onset date and 12 months of continuous disability are required to be entitled to Social Security disability benefits.  See 42 U.S.C. § 423(d)(1).

16

to concern about Plaintiff's weight.[26]  At the time, Plaintiff's
height was 4'11" and she weighed 70 pounds.  Plaintiff reported
that her daily food intake was limited to 16 ounces of chocolate
milk.  The report of Plaintiff's evaluation does not indicate the
recommended plan, and there is no other evidence in the record
concerning the treatment provided to Plaintiff at that time.  (R.
267-70).

## III.  Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under 42 U.S.C.
§ 405(g) and § 1383(c)(3) (incorporating § 405(g)), which provide
that an individual may obtain judicial review of any final
decision of the Commissioner by bringing a civil action in the
district court of the United States for the judicial district in
which the individual resides.  Based upon the pleadings and the
transcript of the record, the district court has the power to
enter a judgment affirming, modifying or reversing the
Commissioner's decision with or without a remand for a rehearing.

The Court's review of the Commissioner's decision is limited
to determining whether the decision is supported by substantial

---

[26]There is no evidence relating to Plaintiff's weekly
psychotherapy sessions with Ms. Heider at Mon Yough in the
administrative file.  Presumably, this evidence was the most
significant evidence that counsel was seeking to obtain from Mon
Yough in connection with his request for a subpoena from the ALJ.
As noted previously, although Plaintiff sees Dr. Bhutta at Mon
Yough, she testified that her contact with Dr. Bhutta is limited
to his completion of forms required by welfare.  (R. 45).

17

evidence, which has been described as "such relevant evidence as
a reasonable mind might accept as adequate to support a
conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971).
It consists of something more than a mere scintilla, but
something less than a preponderance. Dobrowolsky v. Califano,
606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have
decided the case differently, it must accord deference to the
Commissioner and affirm the findings and decision if supported by
substantial evidence. Monsour Medical Center v. Heckler, 806
F.2d 1185, 1190-91 (3d Cir.1986).

## IV.  Legal Analysis

### A.  The ALJ's Decision

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months.  42 U.S.C.
§ 423(d)(1).  A Social Security claimant is considered unable to
engage in any substantial gainful activity only if her physical
or mental impairment or impairments are of such severity that she
is not only unable to do her previous work but cannot,
considering her age, education, and work experience, engage in
any other kind of substantial gainful work which exists in the

18

national economy.  42 U.S.C. § 423(d)(2)(A).

     In <u>Burnett v. Commissioner of Social Security Admin.</u>, 220
F.3d 112 (3d Cir.2000), the Third Circuit discussed the procedure
an ALJ must follow in evaluating a claim for Social Security
disability benefits, stating in relevant part:

                    *    *    *

     In <u>Plummer</u>, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

          In step one, the Commissioner must determine
     whether the claimant is currently engaging in
     substantial gainful activity.  20 C.F.R. § 404.1520(a).
     If a claimant is found to be engaged in substantial
     gainful activity, the disability claim will be denied.
     <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140, 107 S.Ct. 2287,
     2290-91, 96 L.Ed.2d 119 (1987).  In step two, the
     Commissioner must determine whether the claimant is
     suffering from a severe impairment.  20 C.F.R.
     § 404.1520(c).  If the claimant fails to show that her
     impairments are "severe," she is ineligible for
     disability benefits.

          In step three, the Commissioner compares the
     medical evidence of the claimant's impairment to a list
     of impairments presumed severe enough to preclude any
     gainful work.  20 C.F.R. § 404.1520(d).  If a claimant
     does not suffer from a listed impairment or its
     equivalent, the analysis proceeds to steps four and
     five.  Step four requires the ALJ to consider whether
     the claimant retains the residual functional capacity
     to perform her past relevant work.  20 C.F.R.
     § 404.1520(d).  The claimant bears the burden of
     demonstrating an inability to return to her past
     relevant work.  <u>Adorno v. Shalala</u>, 40 F.3d 43, 46 (3d
     Cir.1994).

          If the claimant is unable to resume her former
     occupation, the evaluation moves to the final step.  At
     this stage, the burden of production shifts to the
     Commissioner, who must demonstrate the claimant is
     capable of performing other available work in order to

                               19

> deny a claim of disability. 20 C.F.R. § 404.1520(f).
> The ALJ must show there are other jobs existing in
> significant numbers in the national economy which the
> claimant can perform, consistent with her medical
> impairments, age, education, past work experience, and
> residual functional capacity. The ALJ must analyze the
> cumulative effects of all the claimant's impairments in
> determining whether she is capable of performing work
> and is not disabled.

Plummer, 186 F.3d at 428.

\*   \*   \*

220 F.3d at 118-19.

With respect to the ALJ's five-step sequential evaluation in
the present case, step one was resolved in Plaintiff's favor:
that is, the ALJ found that Plaintiff had not engaged in
substantial gainful activity since her alleged onset date of
disability of October 1, 2004. (R. 210). As to step two, the
ALJ found that the medical evidence established a severe
impairment, i.e., anorexia nervosa, but that this severe
impairment had not persisted for a continuous period of at least
12 months as required by the Social Security Act. (R. 21).
Regarding step three, the ALJ found that Plaintiff's eating
disorder did not meet or equal the requirements of any listed
impairment in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in
particular, Listing 12.06 relating to anxiety disorders. (R.
21). Turning to step four, the ALJ found that Plaintiff was

20

unable to perform any of her past relevant work due to her RFC.[27]
(R. 23). Finally, at step five, based on the testimony of the
VE, the ALJ found that considering Plaintiff's age, education,
past work experience and RFC, there were a significant number of
jobs at the light exertional level in the national economy which
Plaintiff could perform, including the jobs of hotel clerk
(107,000 jobs nationally), information clerk (20,000 jobs
nationally) and security guard (300,000 jobs nationally).  (R.
24).

## B. Plaintiff's Arguments

Plaintiff raises three arguments in support of her motion
for summary judgment seeking a remand of this action to the
Commissioner for further proceedings.  The Court will address
each argument individually.

i

Plaintiff's first argument in support of a remand pertains
to the absence of her complete treatment records from Mon Yough.

_____

[27]As noted previously, the ALJ found that Plaintiff retained
the RFC to perform light work that did not require a high degree
of manual dexterity, rapid movements of the hands or constant use
of the hands; that permitted a sit/stand option at will; that did
not expose Plaintiff to fumes, dust, gas, odors, dampness,
humidity, heights, moving machinery, vibrations and poor
ventilation; and that did not require climbing ladders, ropes or
scaffolding.  (R. 21).  The Court is perplexed by the ALJ's
findings related to Plaintiff's purported restrictions in the use
of her hands and the environmental restrictions.  After reviewing
the entire administrative record, the Court can find no medical
evidence or testimony to support these limitations.

21

Plaintiff concedes that based on the medical evidence before the ALJ, his decision denying her applications for DIB and SSI was not unreasonable. Plaintiff contends, however, that the ALJ erred by failing to issue a subpoena for the complete treatment records of Mon Yough as requested on several occasions, and, in particular, the records of her weekly psychotherapy sessions. After consideration, the Court agrees.

In support of her first argument, Plaintiff cites a portion of 20 C.F.R. § 416.1450(d)(2), pursuant to which a claimant may file a written request with the ALJ assigned to his or her case for the issuance of a subpoena for documents or witnesses. As noted by the Commissioner, however, a reading of Section 416.1450(d)(2) in its entirety shows that the regulation is inapplicable in this case. First and foremost, under Section 416.1450(d)(2), a written request to an ALJ for a subpoena of documents or witnesses must be filed "at least 5 days before the hearing date," and Plaintiff's first written request to the ALJ for a subpoena of Mon Yough's records was not filed until March 10, 2006, approximately 3 months after the hearing in this case. Second, Section 416.1450(d)(2) provides that a written request to an ALJ for the production of witnesses or documents "must ... state the important facts that the witness or document is expected to prove," and such a statement was not included in either of the written requests of Plaintiff's counsel for the

issuance of a subpoena of Plaintiff's complete Mon Yough treatment records.

Despite the inapplicability of Section 416.1450(d)(2) in this case, the Court nevertheless agrees with Plaintiff that the ALJ erred by failing to issue a subpoena to Mon Yough for Plaintiff's complete treatment records.[28]  Under the Social Security Regulations, as well as case law, an ALJ is responsible for developing a claimant's complete medical history.  In the event Plaintiff's complete treatment records were not, or could not be, produced by Mon Yough, the ALJ should have ordered a consultative examination of Plaintiff.[29]  In this connection, the Social Security Regulations provide:

§ **404.1512 Evidence.**

\*    \*    \*

---

[28]In this connection, the Court notes that the Pennsylvania Bureau of Disability Determination did request Plaintiff's treatment records from Mon Yough in connection with her applications for DIB and SSI.  However, the request was made on November 23, 2004, and the only record produced in response to the request was Dr. Bhutta's report regarding his psychiatric evaluation of Plaintiff on December 8, 2004, approximately 2 months after her alleged onset date of disability.  Thus, Mon Yough's response to the prior request for Plaintiff's treatment records is insufficient for Plaintiff to establish the 12-month duration of disability required for entitlement to Social Security disability benefits.

[29]In light of Plaintiff's long history of mental health treatment at Mon Yough, on remand, the Court recommends that a medical source statement of Plaintiff's ability to perform work-related activities also be obtained from her treating source(s) at Mon Yough.

23

    (d) *Our responsibility.* Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application.  We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports.

*   *   *

    (f) *Need for a consultative examination.* If the information we need is not readily available from the records of your medical treatment source, ... we will ask you to attend one or more consultative examinations at our expense.  See §§ 404.1517 through 404.1519t for the rules governing the consultative examination process.  Generally, we will not request a consultative examination until we have made every reasonable effort to obtain evidence from your medical sources.  However, in some instances, such as when a source is known to be unable to provide certain tests or procedures or is known to be nonproductive or uncooperative, we may order a consultative examination while awaiting receipt of medical source evidence.  We will not evaluate this evidence until we have made every reasonable effort to obtain evidence from your medical sources.

*   *   *

20 C.F.R. § 404.1512(d) and (f).

*See also* <u>Ventura v. Shalala</u>, 55 F.3d 900 (3d Cir.1995)(ALJ has duty to develop full and fair record in Social Security cases and, thus, must secure relevant information regarding claimant's entitlement to benefits).

The absence of the records of Plaintiff's weekly psychotherapy sessions at Mon Yough creates a significant evidentiary gap in this case, *i.e.*, from December 2004, when Dr. Bhutta evaluated Plaintiff at Mon Yough and assessed her GAF

24

score to be 50 (denoting serious symptoms or serious impairment in social and occupational functioning), to October 2005, when Plaintiff was referred to WPIC by her psychotherapist at Mon Yough due to concern about Plaintiff's weight which was 70 pounds at that time.[30]  Without such records, Plaintiff is unable to establish the required 12-month period of continuous disability which was the basis for the ALJ's denial of her applications for DIB and SSI.[31]

ii

Next, Plaintiff argues that the ALJ erred by describing the results of Dr. Bhutta's psychiatric evaluation of Plaintiff on December 8, 2004 as "unremarkable," and by giving "little weight"

---

[30]It appears that Plaintiff's psychotherapist at Mon Yough may have changed over time.  The evidence establishes that Plaintiff began weekly individual psychotherapy sessions at Mon Yough upon discharge from WPIC in October 2004.  (R. 228). However, at the hearing before the ALJ on December 8, 2005, Plaintiff testified that she had been seeing her current psychotherapist, Anita Heider, on a weekly basis "[f]or quite a few months ... since September or something like that."  (R. 45).

[31]The ALJ's failure to issue a subpoena for Plaintiff's complete treatment records from Mon Yough or schedule a consultative examination of Plaintiff or obtain a medical source statement from one or more of Plaintiff's treating sources is especially troubling because the records are critical for a just determination of Plaintiff's entitlement to DIB.  As noted by her counsel, Plaintiff's insured status for purposes of eligibility for DIB expired on June 30, 2005, and the ALJ's decision was not issued until March 28, 2006.  Thus, if the ALJ's decision is not reversed, any claim for the DIB sought in this case will be forever barred.

25

to Dr. Bhutta's opinion on September 23, 2005 that Plaintiff was unable to work at that time as a result of anorexia nervosa. Turning first to Dr. Bhutta's December 8, 2004 report of Plaintiff's psychiatric evaluation, the Court agrees with Plaintiff that the ALJ's discussion concerning the report was "highly selective." Although the ALJ may have described fairly the results of Plaintiff's mental status examination by Dr. Bhutta on December 8, 2004, he ignored the portions of the report relating to Plaintiff's long history of anorexia nervosa, her complaints to Dr. Bhutta of poor sleep, poor appetite, lightheadedness, dizziness and weakness, and the GAF score of 50 assigned to Plaintiff by Dr. Bhutta which indicates serious symptoms or impairments.

As to the failure of the ALJ to give more weight to the opinion of Dr. Bhutta on September 23, 2005 regarding Plaintiff's inability to work at that time, the weight attributed to Dr. Bhutta's opinion by the ALJ was based, in large part, on the lack of medical evidence to support the opinion.[32] However, this is precisely the evidence that Plaintiff's counsel was seeking to obtain from Mon Yough through the ALJ's issuance of a subpoena.

---

[32]In this regard, the ALJ states: "The record was held open for a reasonable period to allow submission of additional evidence but none was received.... In light of all the above, the [ALJ] can give little weight to a September 23, 2005, letter from Dr. Bhutta stating that Ms. Bokin was 'unable to work so support herself at this time.'" (R. 23).

26

Under the circumstances, the ALJ improperly relied on the absence
of such evidence to support his conclusion that Dr. Bhutta's
September 23, 2005 opinion was entitled to "little weight."

Under the circumstances, on remand, the ALJ should discuss
further the findings reported by Dr. Bhutta following Plaintiff's
psychiatric evaluation on December 8, 2004. In addition, if, on
remand, Plaintiff's complete treatment records from Mon Yough are
produced, the ALJ should re-evaluate the weight to be attributed
to Dr. Bhutta's September 23, 2005 opinion regarding Plaintiff's
inability to work at that time.

iii

Finally, in support of his adverse decision, the ALJ relied
on Plaintiff's purported testimony regarding her activities of
daily living. Specifically, the ALJ stated:

\*   \*   \*

> By Ms. Boykin's own testimony she is still able to engage in
> a wide range of daily activities. The claimant testified
> that she lives alone in an apartment. She described no
> particular difficulties performing personal needs
> independently such as bathing and dressing. The claimant
> can perform household chores such as cleaning and laundry.
> She is able to cook for herself. Despite Ms. Boykin's
> allegations of fatigue, she testified that she goes to bed
> at 10:00 or 11:00 pm every night, sleeps through the night
> without interruption, and arises at 7:00 am each day.

(R. 23).

Plaintiff asserts that the ALJ's characterization of her

testimony is "flatly inconsistent with the record." After

consideration, the Court agrees.

27

With respect to personal hygiene, such as brushing her teeth and taking a shower in the morning, Plaintiff did testify that she is able to perform these activities. However, Plaintiff's precise testimony was that, although tired upon waking in the morning, she is able to "get through" these activities. (R. 47). As to household chores, such as cleaning, laundry and cooking, Plaintiff did testify that she tries to keep her apartment clean, she does her own laundry and she knows how to cook. (R. 47-48). However, Plaintiff testified further that she does her laundry with her mother and she has to rest for several hours after engaging in any of these activities for an hour. (R. 48, 51). Regarding the ALJ's finding that Plaintiff's allegations of fatigue are undermined by her testimony that she is able to sleep through the night, such testimony is not necessarily inconsistent with a claim of fatigue or lack of energy from not eating properly.

In sum, the Court agrees with Plaintiff that the ALJ unfairly characterized her testimony concerning daily activities to support his adverse decision, ignoring her testimony that she wants to exercise but has "no energy" (R. 46); that her daily activity is basically "just getting up" (R. 48); that she really does not do anything and cannot do anything (R. 48); that she suffers from the same level of fatigue every day (R. 51); that it is hard for her to "even open up a door" (R. 51); and that her

28

parents help her with any chores that she cannot do by herself
(R. 52).[33]  Accordingly, on remand, the ALJ should re-evaluate the
daily activities of Plaintiff based on the entirety of the
evidence, keeping in mind the well-established principle in
Social Security law that a claimant's sporadic or transitory
activity does not disprove disability.  *See, e.g.*, <u>Smith v.
Califano</u>, 637 F.2d 968, 971-72 (3d Cir.1981).

*William L. Standish*

William L. Standish
United States District Judge

Date: October *30*, 2007

---

[33]The Court also notes that the Daily Activities
Questionnaire completed by Plaintiff on November 27, 2004, which
the ALJ does not mention in his decision, is consistent with her
hearing testimony.  (R. 98-102).